Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Bridget Psarianos (AK Bar No. 1705025)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
(907) 276-4244
sbostrom@trustees.org
bbrisson@trustees.org
bpsarianos@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, ALASKA WILDERNESS LEAGUE, CONSERVATION LANDS FOUNDATION, DEFENDERS OF WILDLIFE, NORTHERN ALASKA ENVIRONMENTAL CENTER, and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> DOUGLAS BURGUM, in his official capacity as Secretary of the Interior, UNITED STATES DEPARTMENT OF THE INTERIOR, and BUREAU OF LAND MANAGEMENT, <br><br> Defendants. | Case No. 3:26-cv-00078 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501–6508; Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–3233; National Environmental Policy Act, 42 U.S.C. §§ 4321–4370j; Administrative Procedure Act, 5 U.S.C. §§ 701–706)

Plaintiffs Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Conservation Lands Foundation, Defenders of Wildlife, Northern Alaska Environmental Center, and the Sierra Club file this Complaint for Declaratory and Injunctive Relief, and hereby allege:

## I.      NATURE OF THE CASE

1.      At over 23-million acres, the National Petroleum Reserve–Alaska (Reserve) is the largest single block of federal public land in the United States. It provides habitat for numerous fish and wildlife species, many of which are vitally important for subsistence use. These include two caribou herds, polar bears, raptors, and millions of migratory birds that travel to the Reserve each year. Areas in the Reserve such as Teshekpuk Lake, the Colville River, and the Utukok River Uplands have been recognized for decades as being particularly significant because of their importance to wildlife.

2.      Under the management plan for the Reserve adopted in 2013, called the Integrated Activity Plan (IAP), the Bureau of Land Management (BLM) closed approximately half of the Reserve to oil and gas activity because of the need to protect sensitive areas like Teshekpuk Lake. Despite its 2013 decision and BLM's statutory obligation to provide maximum protection for wildlife, subsistence, and other important

values in the Reserve, BLM adopted a revised IAP on December 31, 2020, that opened over 82% of the Reserve to oil and gas leasing and other infrastructure — including all of the Teshekpuk Lake Special Area. The 2020 IAP dramatically reduced protections for sensitive species and habitats across the Reserve. It eliminated the Colville River Special Area and shifted the boundaries of the Teshekpuk Lake Special Area and the Utukok River Uplands Special Area.

3. After President Joe Biden took office, BLM issued a new decision — the 2022 IAP — that revoked the 2020 IAP and reinstated the 2013 IAP.

4. In 2025, the Trump Administration initiated a new process to open additional areas of the Reserve to oil and gas development and roll back various protections in the Reserve. That process culminated in BLM finalizing an environmental assessment (EA) and adopting a new decision (2025 IAP) that reinstated the same management framework BLM had adopted in the 2020 IAP.

5. In adopting the final EA and record of decision (ROD) for the 2025 IAP, BLM and the United States Department of the Interior (DOI) failed to comply with multiple statutes and regulations that impose important protections for the Reserve. These laws require careful consideration of the impacts of BLM's decision, the consideration of mitigation measures to protect the Reserve, and that BLM adopt mitigation measures and provide maximum protection for areas with significant wildlife and other values.

6.      This action seeks declaratory and injunctive relief against the Secretary of the Interior (Secretary), DOI, and BLM for their decision to adopt the 2025 IAP for the Reserve. DOI and BLM's decision, along with the related EA, violates the Naval Petroleum Reserves Production Act (Reserves Act), 42 U.S.C. §§ 6501–6508 and its regulations; the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3101–3233; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370h and its regulations; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702–706.

7.      Plaintiffs bring this action to invalidate BLM's unlawful EA and ROD and any related or subsequent decisions based on those documents.

8.      Plaintiffs seek vacatur, declaratory, and injunctive relief to compel agency action unlawfully withheld and because BLM's decision is arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law. 5 U.S.C. § 706.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel mandatory duty), 2201 (declaratory relief), and 2202 (injunctive relief).

10.     Plaintiffs have a right to judicial review and Defendants' sovereign immunity is waived under the APA, 5 U.S.C. §§ 701–706.

11. This action is timely under the Reserves Act, 42 U.S.C. § 6506a(n)(1).

12. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State and Arctic District Offices and because the public lands at issue in the case are located in Alaska.

### III. PARTIES

<u>Plaintiffs</u>

13. Plaintiff Sovereign Iñupiat for a Living Arctic (SILA) is an Alaska-based grassroots organization made up of Iñupiat Peoples and community members. SILA's mission is "to create space for healthy communities, spiritually, mentally, and physically; fostering the connection between people, culture, and land. We are empowered as frontline communities and those who have inherent connection with the land and what it provides." SILA seeks to accomplish its mission through community and shareholder engagement, knowledge-sharing events, political advocacy, and revitalizing Iñupiaq intergenerational culture and language. SILA's major focus is uplifting the voices of communities in Arctic Alaska, including a focus on the Western Arctic and development near the community of Nuiqsut. SILA actively works to empower Arctic communities to protect their interests by engaging in administrative processes with the goal of ensuring meaningful involvement for these communities. This includes advocacy and outreach around projects and other actions related to the Arctic, including at public hearings.

14.     Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993, with offices in Washington, D.C. and Alaska. The mission of the organization is to protect Alaska's wild lands and waters by inspiring broad support for federal policy action, so that Alaska's wild landscapes endure to support vibrant communities and abundant wildlife. In addition to its focus on Alaska's Arctic — which includes the Reserve and Arctic National Wildlife Refuge — the organization has a long history working on issues affecting Southeast Alaska, and it has worked to secure protections for the Arctic Ocean, Chugach National Forest, and public lands statewide over the decades. AWL actively works on issues related to oil and gas development and the protection of Special Areas and values in the Reserve. AWL is committed to ensuring protections for public lands across Alaska, while honoring the human rights and traditional values of Alaska's Indigenous communities and subsistence users. The organization has 130,000 active members and supporters nationwide that it mobilizes to achieve changes in federal policy.

15.     Plaintiff Conservation Lands Foundation (CLF) is a nonprofit organization established in 2007, with offices across the country, including in Haines, Alaska. CLF is the only organization in the country dedicated to establishing and safeguarding the National Conservation Lands. CLF's mission is to harness the power of community-led advocacy and the Friends Grassroots Network to protect, restore, and expand the National Conservation Lands managed by BLM through education, advocacy, and partnerships.

CLF created, developed, and has grown the Friends Grassroots Network, a collection of more than eighty local groups and organizations from around the nation dedicated to protecting, restoring, and expanding BLM's conservation mission. CLF actively works to protect Special Areas and values in the Reserve, such as the Teshekpuk Lake Special Area, and to reduce the impacts of oil and gas development in the Reserve.

16.     Plaintiff Defenders of Wildlife (Defenders) is a nonprofit organization founded in 1947 with nearly 2 million members and supporters, including over 7,000 in Alaska. Defenders has offices across the country, including Anchorage. Its mission is to protect all North American native animals and plants in their natural communities. Defenders works to protect and restore key species and their habitats through education, advocacy, litigation, and other efforts. It advocates for the sound management of our public lands and wildlife, including the Reserve. Defenders prioritizes imperiled species and also works to reduce human-wildlife conflicts. Defenders has actively worked to promote wildlife habitat conservation and public land management in Alaska, including in the Arctic. Defenders serves on the U.S. Fish and Wildlife Service's Polar Bear Recovery Advisory Work Group on Reducing Human-Polar Bear Conflicts. Defenders also works to reduce any conflicts or impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Reserve and elsewhere in the Arctic.

17. Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with 418 members, approximately 60% of whom are located in Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy, with the goal of ensuring that Alaska's globally significant wildlands remain healthy, biologically diverse, and productive for present and future generations. One of the Northern Center's major focus areas is its Arctic program. The Northern Center actively works to protect the Arctic, its communities, and vital wildlife habitats and wildlands, including areas like Teshekpuk Lake in the Reserve, from the harms associated with oil and gas development. The Northern Center also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to oil and gas development in the Arctic, including the challenged action. The Northern Center provides its members and the public with information about the impacts of oil and gas on the Arctic, enabling members to participate as well.

18. Plaintiff Sierra Club is a national nonprofit organization of approximately 614,500 members dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these

objectives. The Alaska Chapter of the Sierra Club has approximately 1,280 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, and the organization has long been active on issues related to oil and gas activities in America's Arctic, including the Reserve. Sierra Club members use the public lands in the Arctic and Reserve for quiet recreation, aesthetic pursuits, and spiritual renewal. These areas would be threatened by increased oil and gas development that could result from the revised IAP.

19. Plaintiffs' members, supporters, staff, and board members work, visit, and recreate in and around the Reserve and plan to return to the Reserve. Plaintiffs' members and supporters also live in and around the Reserve. Plaintiffs' members and supporters use the Reserve and depend on the health of the subsistence resources in the Reserve to support their subsistence way of life. Plaintiffs' members, supporters, staff, and board members have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the Reserve, and they enjoy or use wildlife that inhabit the Reserve.

20. Plaintiffs' members' and supporters' interests in, use, and enjoyment of the areas have been, are being, and will continue to be adversely affected by oil and gas activities in the Reserve. The expanded leasing program and oil and gas activities allowed by the 2025 IAP will degrade and harm wildlife and habitat, thereby harming the interests of Plaintiffs and their members and supporters. Oil and gas leasing and on-the-ground

activities enabled by the 2025 IAP will also impede members' ability to access subsistence resources in the region. The reduction in protections and expansion of areas open to oil and gas and other infrastructure will adversely affect the natural environment and wildlife used and enjoyed by Plaintiffs' members and supporters and harm the interests of Plaintiffs and their members and supporters.

21.     Plaintiffs actively work to protect the Reserve's values and resources and any reduction in protections for areas in the Reserve, and expansion of leasing and oil and gas activities will cause groups direct, immediate, and irreparable injury. Damage to the Reserve poses a threat to groups' programs and work, will frustrate Plaintiffs' missions, and will drain groups' resources by forcing them to divert resources away from their core mission.

22.     Plaintiffs and their members have a procedural interest in Defendants' full compliance with planning and decision-making processes under NEPA, and in Defendants' duty to substantiate their decision.

23.     These are actual, concrete, and particularized injuries caused by Federal Defendants' failure to comply with mandatory duties under the Reserves Act, ANILCA, NEPA, and the APA.

24.     BLM's adoption of the 2025 IAP and EA violates the Reserves Act, ANILCA, NEPA, and the APA and threatens imminent, irreparable harm to the interests of the Plaintiffs and their members. These actual, concrete injuries suffered by the

Plaintiffs and their members and supporters are fairly traceable to BLM's decision adopting the 2025 IAP and opening additional areas to oil and gas and other infrastructure, and would be redressed by the relief sought in this case.

<u>Defendants</u>

25.     Defendant Douglas Burgum is the Secretary of the Interior and is being sued in his official capacity. Mr. Burgum is the official ultimately responsible under federal law for ensuring that the actions and decisions of DOI and BLM comply with all applicable laws and regulations. Mr. Burgum signed the challenged 2025 IAP decision.

26.     Defendant DOI is an agency of the United States responsible for oversight of BLM.

27.     Defendant BLM is an agency within DOI and is responsible for managing federal lands and the subsurface mineral estate underlying federal lands in the Reserve. BLM is responsible for implementing and complying with federal law, including the federal laws related to the adoption of the 2025 IAP challenged in this action.

## IV.     STATUTORY AND REGULATORY BACKGROUND

<u>The Naval Petroleum Reserves Production Act</u>

28.     The Reserves Act governs BLM's management of the surface values and subsurface resources in the Reserve. 42 U.S.C. §§ 6501–6508. The Reserves Act requires BLM to consider and protect the ecological and other values of the Reserve. *Id.* §§ 6503(b), 6504(a), 6506a(b). Under the Reserves Act, Congress instructed the Secretary to

designate as Special Areas any areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value." *Id.* § 6504(a). The Secretary is required to ensure "maximum protection" for Teshekpuk Lake and other areas designated as having these significant values. *Id.*

29. The Reserves Act requires BLM to include any conditions, restrictions, and prohibitions necessary to mitigate reasonably foreseeable and significant adverse effects on surface resources in the Reserve. *Id.* § 6506a(b). To ensure the protection of these resources, Congress directed BLM to adopt regulations to ensure the agency adequately protects sensitive resources in the Reserve. *Id.* § 6503(b).

30. In its regulations implementing the Reserves Act, BLM defined "Special Areas" as "areas within the reserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve." 43 C.F.R. § 2361.5(f). Its regulations governing Special Area management mandate that "[m]aximum protection measures will be taken on all actions within the [Utukok] River Uplands, Colville River, and Teshekpuk Lake special areas, and any other special areas identified by the Secretary as having significant subsistence, recreational, fish and wildlife, or historical or scenic value." *Id.* § 2361.10(b).

Alaska National Interest Lands Conservation Act

31.     Congress enacted ANILCA "[i]n order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the State of Alaska that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values." 16 U.S.C. § 3101(a).

32.     Under ANILCA Section 810, if an agency is going to withdraw, reserve, lease, or otherwise allow the use, occupancy, or disposition of public land, the agency must first determine the proposed action's impact on subsistence uses. *Id*. § 3120(a). The agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* In doing so, the agency must also consider cumulative impacts. This first part of the agency's analysis is often referred to as the "tier-1 analysis."

33.     If the agency conducts this tier-1 analysis and determines that the activities will not "significantly restrict subsistence uses," then the agency issues a Finding of No Significant Restriction and Section 810's requirements are met. *Id*.

34.     If the agency finds that the proposed action may "significantly restrict" subsistence uses, the agency must move forward with tier-2 of the process and its

analysis. The standard for meeting the tier-1 threshold is "quite low." *Sierra Club v. Penfold*, 664 F. Supp 1299, 1307 (D. Alaska 1987), *aff'd*, 857 F.2d 1307 (9th Cir. 1988).

35. In tier-2, the agency must provide public notice and hold hearings in potentially affected communities. 16 U.S.C. § 3120(a)(2). The agency is forbidden from authorizing an action that would significantly restrict subsistence unless it finds that such restrictions are necessary and consistent with sound public land management principles; involve the minimum amount of public lands necessary to accomplish the purpose of the proposed action; and the agency takes reasonable steps to minimize the adverse impacts to subsistence uses and resources. *Id.* § 3120(a)(3).

### National Environmental Policy Act

36. NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before they act and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. NEPA seeks to ensure that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

37. NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action with reasonably foreseeable significant impacts on the quality of the human environment. *Id.*

38. NEPA requires federal agencies to include alternatives to the proposed action within an EIS. *Id*. The analysis of alternatives is at the core of the environmental analysis, and its purpose is to ensure the public is informed and the decision maker has analyzed a variety of impacts and a range of choices. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

39. In specifying the purpose and need for the agency's action, "an agency cannot define its objectives in unreasonably narrow terms," such that "only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (first quoting *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997); and then quoting *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998)).

40. NEPA also requires that agencies take a hard look at the direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332(2)(C); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380.

41.     NEPA requires that agencies evaluate the environmental consequences of a project, beginning at an early stage of the planning process. Agencies can prepare a high-level programmatic EIS with sufficient detail to foster informed decision-making and defer in-depth evaluation of the site-specific impacts until the agency reaches the point where it proposes to make a critical decision to act on site development. *California*, 690 F.2d at 761.

42.     An agency makes the critical decision to act on site development when it proposes to make an irreversible and irretrievable commitment of resources to a project at a particular site. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 801 (9th Cir. 2003). If an agency proposes to make an irreversible and irretrievable commitment of resources, an agency cannot defer the analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time when there is a specific proposal made or application submitted. *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002). Once an agency makes an irreversible and irretrievable commitment of resources, prior programmatic statements are no longer enough; the agency must conduct a site-specific analysis of the impacts of the proposed action. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006).

Administrative Procedure Act

43.     Courts review agency actions under the APA. 5 U.S.C. §§ 702, 704.

44.     Under the APA, Courts "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory authority," or made "without observance of procedure required by law." *Id.* § 706(2).

45.     When an agency changes policy or course, it must "supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). More specifically, it must acknowledge the change in course, show that the new decision is permissible under the statute, express that it is a better policy, and provide good reasons for the change in policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015). When reversing a policy, "an agency may not simply discard prior factual findings without a reasoned explanation." *Organized Village of Kake*, 795 F.3d at 968. Instead, when a policy change rests on new factual findings that contradict prior findings and circumstances, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television Stations*, 556 U.S. at 515–16; *see also Organized Village of Kake*, 795 F.3d at 966.

## V.    FACTS

### The Exceptional Values of the Reserve

46.    At approximately 23 million acres — an area roughly the size of Indiana — the Reserve is the largest single federal public land unit in the country. The Reserve provides rich habitat for caribou, grizzly and polar bears, wolves, and an array of migratory birds and waterfowl. It is also home to the Western Arctic and Teshekpuk Lake Caribou Herds, which provide key subsistence resources to numerous communities in the Reserve and across Northwest Alaska.

47.    Teshekpuk Lake is one of the most productive wetland complexes in the Arctic and provides vital nesting habitat for hundreds of thousands of migratory birds. The Teshekpuk Lake area, along with the neighboring Smith Bay marine habitat, supports the highest density of shorebirds in the circumpolar Arctic, including threatened spectacled eiders, Steller's eiders, yellow-billed loons, dunlins, and American golden-plovers. As many as 35,000 greater white-fronted geese and 37,000 brant geese molt in the area, as do thousands of Canada geese and snow geese. This region is also the primary calving grounds for the Teshekpuk Lake Caribou Herd.

48.    The Colville River Delta is the largest and most ecologically rich river delta in northern Alaska. The cliffs along the Colville River provide critical nesting sites and adjacent hunting areas for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

49. President Warren G. Harding originally set aside the Reserve in 1923 as a petroleum reserve for the U.S. Navy.

50. In 1976, it was re-designated and Congress passed the Reserves Act — a new law recognizing the exceptional ecological values in the Reserve. The law instructed the Secretary to designate any areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value[s]" as special areas and to provide "maximum protection" for those values. 42 U.S.C. § 6504(a).

51. Based on this authority, the Secretary designated multiple Special Areas — including the Teshekpuk Lake and Colville River Special Areas — to ensure maximum protection of the environment, fish and wildlife, and historical or scenic values. 42 U.S.C. § 6504(a); National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28723 (June 3, 1977).

52. The Colville River Special Area was initially designated to protect peregrine falcons and their nesting habitat, and the Teshekpuk Lake Special Area was designated to protect "important nesting, staging, and molting habitat" for waterfowl and other migratory birds. National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. at 28723.

53. Consistent with its regulations governing Special Areas, the Secretary explained that "steps to minimize adverse impacts on existing resources resource values will be required and implemented" for proposed activities in these Special Areas. *Id.*

54. Over the years, the boundaries of the Special Areas have been expanded, and the Secretary has designated new Special Areas. *See, e.g.*, Designation of Addition to Special Areas in National Petroleum-Alaska; Alaska, 70 Fed. Reg. 9096 (Feb. 24, 2005).

<u>Past IAPs and Decisions Related to the Reserve</u>

55. BLM adopted the first-ever management plan covering the entire Reserve with its 2013 IAP. Prior plans covered only the northeastern or northwestern planning areas; there had never been a plan adopted for the southern area of the Reserve.

56. The 2013 IAP set out broad decisions for how BLM would manage resources and the values in the Reserve. As part of the process for adopting the IAP, BLM prepared an EIS pursuant to NEPA to look at various management and land-allocation alternatives. In issuing the ROD for the 2013 IAP, BLM adopted an alternative that protected many of the wildlife, habitat, and subsistence values of the Reserve, but also made approximately 11.8-million acres — approximately 52% — of the Reserve available for oil and gas leasing and development. The 2013 IAP also incorporated stipulations and best management practices applicable to oil and gas and other activities in the Reserve.

57. The 2013 IAP expanded the Teshekpuk Lake Special Area from 1.75-million acres to 3.65-million acres and expanded its purposes to include protecting caribou and shorebird habitat. It closed approximately 3.1 million acres of the Teshekpuk Lake Special Area to oil and gas leasing because of the area's importance to subsistence

users and wildlife, including the Teshekpuk Lake Caribou Herd. The 2013 IAP expanded the protections for the Colville River Delta by prohibiting permanent oil and gas facilities within two miles of the Colville, Kikiakrorak, and Kogosukruk rivers. BLM also expanded the purpose of the Colville River Special Area to protect all raptor species.

58.     In response to comments, BLM stated that it expanded the Special Areas "to better reflect the BLM's understanding of the significance of these areas." 1 BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, NATIONAL PETROLEUM RESERVE-ALASKA: FINAL INTEGRATED ACTIVITY PLAN/ENVIRONMENTAL IMPACT STATEMENT 36 (2012). BLM also noted that it believed the statutory basis for Special Area designation was still met and stated that reducing or eliminating Special Areas would not be consistent with the purpose and need for the action: to facilitate oil and gas and protect surface resources. *Id.*

59.     In making its decision, BLM explained that expanding the Teshekpuk Lake Special Area provided "important protections for areas critical to numerous subsistence species" and access routes for subsistence. BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, NATIONAL PETROLEUM RESERVE-ALASKA INTEGRATED ACTIVITY PLAN: RECORD OF DECISION iv (2013). BLM explained in detail how the expanded boundaries of the Teshekpuk Lake Special Area would protect key habitat and species — namely, caribou, water, and shore birds — and how decisions to exclude areas from leasing were important to achieve those protections.

60. BLM also explained that the expansion and protection of Special Areas helped achieve BLM's mandates in the Reserves Act by protecting surface values.

61. In 2020, BLM issued a revised IAP accompanied by an EIS and ROD. The 2020 IAP dramatically reduced protections for sensitive species and habitats across the Reserve. It opened over 82% of the Reserve to oil and gas development. It also eliminated the Colville River Special Area and shifted the boundaries of the Teshekpuk Lake Special Area and the Utukok River Uplands Special Area. Although it expanded the boundary of the Teshekpuk Lake Special Area on the western side, it also removed areas south of the lake that were previously within the boundary.

62. In the 2020 EIS, BLM stated that the EIS was intended to fulfill BLM's NEPA obligations for lease sales conducted in the Reserve through at least 2039 and potentially thereafter, absent a need to supplement that analysis to consider new circumstances or information.

63. Groups, including several Plaintiffs, timely filed a lawsuit challenging the 2020 IAP EIS and later amended their complaint to challenge the 2020 IAP ROD. First Am. Compl. for Declaratory & Injunctive Relief, *N. Alaska Env't Ctr. v. Haaland*, No. 3:20-cv-00207-SLG (D. Alaska Sept. 22, 2022).

64. After President Biden took office, BLM issued a new IAP ROD (the 2022 IAP) that revoked the 2020 IAP decision and reinstated the 2013 IAP. BLM issued a Determination of NEPA Adequacy to support its reliance on the 2020 IAP/EIS for NEPA

purposes. In making that decision, BLM did not initially remove statements from the 2020 EIS stating that BLM would not prepare any additional environmental analyses for future lease sales.

65.     BLM then issued an errata stating that the 2020 IAP/EIS was programmatic in nature and was not sufficient to excuse the agency from needing to do further environmental reviews for future lease sales, consistent with NEPA.

66.     In reliance on BLM's acknowledgements in the errata and adoption of the new 2022 IAP ROD, Plaintiffs in the *Northern Alaska Environmental Center* lawsuit agreed to voluntarily dismiss that lawsuit.

67.     In 2023, as part of BLM's approval of ConocoPhillips' Willow Master Development Plan, DOI imposed Mitigation Measure 27, which directed BLM to develop compensatory mitigation to protect the Teshekpuk Lake Caribou Herd and its key habitat. That process culminated in the creation of the Teshekpuk Lake Conservation Right of Way, which involved BLM issuing a conservation right-of-way to the Nuiqsut Trilateral, Inc. (NTI). BUREAU OF LAND MGMT., TESHEKPUK LAKE CONSERVATION RIGHT OF WAY: FACT SHEET (2024). That right-of-way applied to one million acres within the Teshekpuk Lake Special Area and generally prohibited new oil and gas leasing and surface infrastructure absent the approval of NTI. The agreement was intended to provide protections for the Teshekpuk Lake Caribou Herd, their habitat, and subsistence.

68. In 2024, BLM finalized regulations updating the management and protection provisions for the Reserve for the first time in forty years. Management and Protection of the National Petroleum Reserve in Alaska, 89 Fed. Reg. 38712 (May 7, 2024). Those rules established standards and procedures for managing and protecting surface resources in the Reserve from the adverse effects of oil and gas.

69. The rule updated BLM's regulations to incorporate the five existing Special Areas and their significant resource values. The rule established standards and procedures for ensuring BLM met its statutory obligation to provide maximum protection for significant resource values in designated Special Areas. The rule also affirmed that the management priority within Special Areas is to assure maximum protection of significant resource values. To implement that priority, BLM included provisions that closed approximately 11 million acres to leasing, "including most of the Teshekpuk Lake and Utukok River Uplands Special Areas," and limited infrastructure in certain areas. In adopting those measures, BLM stated that it viewed those protections as the regulatory floor to ensure BLM was fulfilling its statutory duty to assure maximum protection for significant resource values in Special Areas. The rule also included provisions related to the designation of Special Areas and requirements for ensuring maximum protection of significant resource values, as well as examples of types of maximum protection measures.

70. Following the adoption of those regulations, BLM issued a request for information seeking input from the public on significant resource values within Special Areas and whether to modify or expand the boundaries of Special Areas in the Reserve. Special Areas Within the National Petroleum Reserve in Alaska, 89 Fed. Reg. 58181 (July 17, 2024). At the end of that process, BLM issued a report synthesizing that feedback. U.S. DEP'T OF THE INTERIOR, MAXIMIZING PROTECTION IN THE NATIONAL PETROLEUM RESERVE-ALASKA: BLM REPORT BASED ON PUBLIC SUBMISSIONS IN RESPONSE TO THE JULY 2024 REQUEST FOR INFORMATION (2025). In that report, BLM recognized subsistence as a significant resource value for all of the Special Areas and adopted interim measures aimed at reducing impacts and ensuring the maximum protection of subsistence. *Id.* at 4; Memorandum from Principal Deputy Dir., Bureau of Land Mgmt., to Bureau of Land Mgmt. Alaska State Dir. re: BLM Interim Management of Special Areas Within the National Petroleum Reserve-Alaska (Jan. 16, 2025).

71. In 2025, following another change in presidential administration, BLM rescinded the management regulations as well as its report and memorandum on the Special Areas. Rescission of the Management and Protection of the National Petroleum Reserve in Alaska Regulations, Issued May 7, 2024, 90 Fed. Reg. 51470 (Nov. 17, 2025); Implementing Executive Order 14153 for Special Areas Within the National Petroleum Reserve-Alaska, 90 Fed. Reg. 35916 (July 30, 2025).

<u>The 2025 IAP and Recent Actions in the Reserve</u>

72. In January 2025, President Trump issued an Executive Order directing the Secretary to take the necessary steps to reinstate the 2020 IAP/EIS and ROD for the Reserve. Exec. Order No. 14153, 90 Fed. Reg. 8347, 8349 (Jan. 29, 2025) [hereinafter EO 14153]. The Secretary then issued a Secretarial Order directing agency staff to develop an action plan for the next steps to implement the Executive Order. Sec'y of the Interior, Order No. 3422 (Feb. 3, 2025) [hereinafter SO 3422].

73. In June, BLM published a draft EA to support reinstating the 2020 IAP for the Reserve. BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, DRAFT NATIONAL PETROLEUM RESERVE IN ALASKA INTEGRATED ACTIVITY PLAN ENVIRONMENTAL ASSESSMENT: DOI-BLM-AK-0000-2025-0005-EA at 2 (2025). BLM stated its purpose and need in reviewing the 2020 IAP/EIS was to determine the appropriate management of all BLM-managed lands in the Reserve in a manner consistent with statutory direction, EO 14153, and SO 3422 to allow the United States to unleash Alaska's resource potential, "efficiently and effectively maximize development and production," and "expedite the permitting and leasing of energy and natural resource projects."

74. The draft EA looked at only two alternatives: the No Action Alternative and an alternative that would readopt Alternative E as analyzed in the 2020 IAP/EIS and adopted in the 2020 ROD. Under that alternative, approximately 82% of the Reserve

would be open to oil and gas leasing, including the entirety of Teshekpuk Lake Special Area.

75.     In the draft EA, BLM asserted that the 2020 IAP/EIS, in tandem with the EA, would serve as the NEPA analysis for lease sales through 2045.

76.     BLM only identified one issue for further analysis in the EA beyond what was analyzed in the 2020 IAP/EIS: how future development of leases in the Reserve might contribute to greenhouse gas emissions, specifically foreseeable downstream greenhouse gas emissions resulting from consumption of oil and gas abroad.

77.     In July 2025, Congress passed a measure as part of the budget reconciliation bill that required BLM to hold multiple lease sales in the Reserve over the coming years, with the first to be held within one year after that bill's passage. Budget Reconciliation Act, Pub. L. No. 119-21, § 50105, 139 Stat. 72, 143–44 (2025). BLM is to offer the same lease form, lease terms, economic conditions, and stipulations set out in the 2020 IAP/EIS and 2020 ROD.

78.     Separately, Congress passed a Congressional Review Act resolution in 2025 nullifying the 2022 IAP Record of Decision. Joint Resolution of Dec. 5, 2025, Pub. L. No. 119-47, 139 Stat. 696.

79.     On December 19, 2025, BLM terminated the Teshekpuk Lake Conservation Right-of-Way. DEPUTY SEC'Y OF THE INTERIOR, U.S. DEP'T OF THE INTERIOR, DECISION: RIGHT-OF-WAY CANCELLATION (Dec. 19, 2025).

80.     On December 22, 2025, the Secretary signed a ROD that revoked the 2022 IAP and reinstated the 2020 IAP/EIS. BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, NATIONAL PETROLEUM RESERVE IN ALASKA INTEGRATED ACTIVITY PLAN RECORD OF DECISION 3 (2025) [hereinafter 2025 ROD]. BLM also published a final EA and Finding of No New Significant Impact for the Reserve IAP to support the reinstatement of the 2020 IAP. BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, NATIONAL PETROLEUM RESERVE IN ALASKA INTEGRATED ACTIVITY PLAN ENVIRONMENTAL ASSESSMENT: DOI-BLM-AK-0000-2025-0005-EA at 3 (2025) [hereinafter Final EA]; BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, FINDING OF NO NEW SIGNIFICANT IMPACT FOR NATIONAL PETROLEUM RESERVE IN ALASKA INTEGRATED ACTIVITY ENVIRONMENTAL ASSESSMENT (2025).

81.     The 2025 ROD adopted the single action alternative considered in the EA, which had the effect of readopting Alternative E from the 2020 IAP/EIS — the same alternative originally adopted in the 2020 ROD.

82.     As with the 2020 decision, the Secretary eliminated the Colville River Special Area and modified the boundaries of the Teshekpuk Lake Special Area. In eliminating the Colville River Special Area, the Secretary stated that raptors are protected across the Reserve and those protections are not unique, so the protections of the Colville River Special Area were no longer needed. For the Teshekpuk Lake Special Area, the Secretary moved the southern boundary northward and eliminated areas from the Special

Area boundaries. The Secretary stated that the boundary was originally drawn to protect yellow-billed loon habitat and that, because loon protections apply across the entire Reserve, no unique management prescriptions were needed anymore for loons.

83.     In the final EA, BLM dismissed any new information since the adoption of the 2020 IAP/EIS as not being significant enough to warrant analysis in an EIS and still only analyzed greenhouse gas emissions in more depth. The agency did not evaluate any other alternatives or measures specific to any forthcoming lease sales. In responding to public comments in the final EA, BLM stated it would not consider any other alternatives because its proposed action was consistent with the direction set forth in EO 14153, SO 3422, and Public Law 119-21.

84.     In the 2025 ROD, the Secretary claimed that Congress' joint resolution had the effect of reverting BLM's management of the Reserve to the 2020 management plan and stated that readopting the 2020 ROD would best comport with recent Executive and Secretarial orders. The Secretary stated that the 2020 IAP/EIS, in combination with the EA, would fulfill any NEPA requirements for lease sales in the Reserve through 2045. The Secretary acknowledged that this approach to NEPA requirements for lease sales diverged from the errata, and BLM stated it was "not carrying forward" the errata. In the final EA, BLM reiterated that the 2020 IAP/EIS and the EA are intended to fulfill the NEPA requirements for lease sales in the Reserve through December 2045.

85. As part of its 2025 decision, BLM did not do a new analysis of the potential impacts to subsistence, consider ways to reduce impacts to subsistence, or hold any meetings in communities that could be impacted by its decision. Instead, BLM relied on the process and analysis it had previously conducted for its 2020 decision.

86. On February 11, 2026, BLM announced it would hold a lease sale in the Reserve on March 18, 2026. Notice of 2026 National Petroleum Reserve–Alaska Oil and Gas Lease Sale Lease Sale, 91 Fed. Reg. 6248 (Feb. 11, 2026). BLM offered over 600 tracts for bid, totaling approximately 5.5 million acres. The areas BLM offered for lease include the majority of the unleased areas of the Teshekpuk Lake Special Area, including areas that were previously closed to leasing, and a number of tracts in the area previously encompassed within the Colville River Special Area.

87. BLM stated in the Detailed Statement of Sale that it was conducting the lease sale under the parameters of the 2025 IAP ROD and that the tracts offered for sale were subject to the stipulations and required operating procedures as set out in that ROD, the analysis for the 2020 IAP/EIS, and the 2025 EA. BUREAU OF LAND MGMT., DEP'T OF THE INTERIOR, NATIONAL PETROLEUM RESERVE-ALASKA, OIL AND GAS LEASE SALE 2026: DETAILED STATEMENT OF THE SALE (2026). BLM did not consider or add any additional stipulations, required operating procedures, or other measures beyond what was encompassed in those decisions. BLM did not conduct any additional NEPA analysis for the lease sale.

<h1 style="text-align:center">CLAIMS FOR RELIEF</h1>

<h2 style="text-align:center">COUNT I</h2>

<strong>(Violation of the Reserves Act and the APA; Failure to Comply with the Reserves Act's Maximum Protection Requirements and Provide a Reasoned Explanation)</strong>

88. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in paragraphs 1–87.

89. Under the Reserves Act and its implementing regulations, the Secretary is required to ensure "maximum protection" for wildlife, subsistence, and other resources and uses in designated Special Areas. *See, e.g.*, 42 U.S.C. § 6504(a); 43 C.F.R. § 2361.10(b).

90. Under the APA, the agency is required to supply a reasoned analysis when it changes policy and cannot disregard prior factual findings without a reasoned explanation. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015).

91. The 2025 IAP dramatically decreases the protections for Teshekpuk Lake and the Utukok River Special Areas and the wildlife and other resources within them by opening them to leasing and other infrastructure. It also entirely eliminates the Colville River Special Area.

92. Defendants' reduction in protections and failure to adopt adequate mitigation measures to protect resources within those areas is inconsistent with the

Reserves Act's maximum protection mandate and with the agency's previous findings regarding the measures necessary to protect wildlife, subsistence, and other values in those areas.

93. Defendants failed to provide a reasoned explanation for their change in position and findings or to adequately explain how such actions are consistent with the agencies' statutory duty to provide maximum protections for the resources and uses in those areas.

94. Defendants' failure to adequately explain their decision and failure to comply with the Reserves Act was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by the Reserves Act and its implementing regulations, and the APA. 5 U.S.C. § 706(2).

**COUNT II**
**(Violation of the Reserves Act and the APA; Failure to Comply with Reserves Act in Modifying Special Area Boundaries and Values)**

95. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in paragraphs 1–87.

96. Under the Reserves Act and its implementing regulations, the Secretary is required to designate as Special Areas any areas containing significant subsistence, recreational, fish and wildlife, or historical or scenic values. *See, e.g.*, 42 U.S.C. § 6504(a). The statute does not include a provision providing for the de-designation of Special Areas.

97. Under the APA, the agency is required to supply a reasoned analysis when it changes policy and cannot disregard prior factual findings without a reasoned explanation. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42; *Organized Village of Kake*, 795 F.3d at 966.

98. Consistent with the mandates in the Reserves Act, the Secretary designated the Teshekpuk Lake Special Area and the Colville River Special Area in 1977. National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28723 (June 3, 1977).

99. In previous decisions designating or expanding the Teshekpuk Lake and Colville River Special Areas, including the 2013 IAP, BLM made numerous findings related to the significance of the wildlife and other resources present in those Special Areas and the need to provide maximum protection for those values. BLM also recognized subsistence as a significant resource value for all the Special Areas.

100. The modification of the Teshekpuk Lake Special Area and elimination of the Colville River Special Area are inconsistent with the statute and beyond the Secretary's statutory authority. The Secretary's elimination and modification of the Special Areas on the ground that mitigation measures related to significant resource values apply across the Reserve is not an appropriate ground under the statute for eliminating or modifying the areas within the boundaries of the Special Areas.

101. When changing the agency's position on the Colville River and Teshekpuk Lake Special Areas, Defendants failed to address BLM's previous factual findings about the presence of significant resource values and need to protect these designated Special Areas.

102. Defendants' decision to eliminate or modify the boundaries of the Colville River and Teshekpuk Lake Special Areas in general and without adequately explaining their change in position was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by the Reserves Act and its implementing regulations, and the APA, and in excess of statutory authority. 5 U.S.C. § 706(2).

**COUNT III**
**(Violation of ANILCA; Failure to Comply with Section 810 of ANILCA)**

103. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in paragraphs 1–87.

104. Pursuant to ANILCA Section 810, agencies must consider adverse effects and restrictions of proposed actions upon subsistence resources and uses. 16 U.S.C. § 3120(a). Actions that would significantly restrict subsistence uses may only be undertaken if BLM finds that such actions are necessary, involve the minimal amount of public lands necessary, and if the adverse effects to subsistence are minimized. *Id*. § 3120(a)(3).

105. BLM failed to comply with ANILCA Section 810 on multiple grounds, including but not limited to BLM's failure to follow the procedural and substantive requirements under ANILCA Section 810 when adopting the 2025 IAP.

106. For the above reasons, BLM's failure to comply with ANILCA Section 810 was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of the procedure required by ANILCA and the APA. 5 U.S.C. § 706(2).

**COUNT IV**
**(Violation of NEPA and the Reserves Act; Failure to Conduct an Adequate NEPA Analysis)**

107. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in paragraphs 1–87.

108. NEPA requires federal agencies to prepare an EIS on any proposal for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

109. The Reserves Act requires that BLM mitigate reasonably foreseeable and significant adverse effects in the Reserve. 42 U.S.C. § 6506a(b). BLM's implementing regulations require BLM to conduct the necessary environmental analysis under NEPA prior to and as part of the tract selection process for the lease sale. 43 C.F.R. § 3131.2(b). Under the regulations, that NEPA analysis is intended to inform BLM's tract selection process for the specific lease sales.

110. The 2025 IAP is a programmatic land use plan that governs BLM's management of the entire Reserve. The 2025 IAP provides broad guidelines about where and how BLM may choose to conduct lease sales at future points in time, but it does not obligate BLM to hold those lease sales or make implementation decisions for specific lease sales at this time.

111. Individual lease sales conducted consistent with the IAP are distinct, major federal actions that are subject to NEPA.

112. BLM acknowledged in the 2022 errata that the 2020 IAP EIS is programmatic and is not a site-specific analysis sufficient to excuse BLM from needing to conduct additional NEPA analyses for future lease sales.

113. Defendants' statement that the 2025 IAP EIS in combination with the EA is the only NEPA analysis required for the lease sales through at least 2045, absent a need to supplement the IAP EIS based on new information, is contrary to the requirements of NEPA and BLM's regulations under the Reserves Act.

114. BLM's EA does not constitute a site-specific analysis sufficient to excuse BLM from needing to do further NEPA analyses for future lease sales.

115. BLM's failure to conduct a NEPA analysis that analyzes future lease sales was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA, the Reserves Act, their implementing regulations, and the APA. 5 U.S.C. § 706(2).

**COUNT V**
**(Violation of NEPA and the Reserves Act; Failure to Adopt an Appropriate Purpose and Need Statement and Consider Alternatives)**

116. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in paragraphs 1–87.

117. NEPA requires agencies to consider a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii). Agencies cannot define the objectives of their action in such narrow terms as to unreasonably exclude other alternatives from consideration.

118. BLM improperly limited the scope of its purpose and need for the agency action and consideration of alternatives to only one action alternative aimed at prioritizing oil and gas. In refusing to consider other alternatives, BLM stated that its alternative was consistent with EO 14153, SO 3422, and Public Law 119-21.

119. BLM failed to properly consider or account for its dual statutory obligations under the Reserves Act to provide maximum protection for significant resource values in Special Areas in its purpose and need statement and in its consideration of alternatives.

120. As a result, BLM failed to consider an alternative or alternatives in the EA that would protect the Reserve's resources and limit the impacts of oil and gas activities, consistent with BLM's statutory obligations.

121. BLM also failed to adequately explain why it did not consider viable alternatives that would reduce the impacts to the Reserve and protect areas and resources

consistent with BLM's statutory obligations. To the extent BLM provided any explanation for not considering viable alternatives, that explanation was arbitrary and capricious.

122. BLM's failure to adopt an appropriate purpose and need statement and consider a reasonable range of alternatives consistent with its statutory obligations under the Reserves Act was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA, the Reserves Act, their implementing regulations, and the APA. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1. Declare that, in taking the actions described above, the Secretary, DOI, and BLM violated the Reserves Act, ANILCA, NEPA, and the APA; declare that the unlawful actions cannot serve as the basis for any agency actions, including the decision to conduct a lease sale and issue leases; and declare that the actions as set forth above are arbitrary, capricious, and not in accordance with law and the procedures required by law, and constitute agency action unlawfully withheld or unreasonably delayed;

2. Vacate and set aside as unlawful the 2025 IAP and the related ROD, EIS, and Section 810 Evaluation, and any decisions that rely on it, including any lease sale decisions and leases;

3. Enter appropriate injunctive relief;

4. Retain continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein;

5. Award Plaintiffs all reasonable costs and fees as authorized by law; and

6. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 19th day of February, 2026,

 s/ Suzanne Bostrom

Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Bridget Psarianos (AK Bar No. 1705025)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*
